**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robbyne Michele Solle, | No. CV-24-08237-PCT-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Robbyne Michele Solle's ("Plaintiff") appeal from the Commissioner of the Social Security Administration's ("SSA," "Commissioner," or "Defendant") denial of Social Security benefits. (Doc. 1). The appeal is fully briefed, (Doc. 8, 12, 13), and the Court now rules.

I.    **BACKGROUND**

On appeal, the Court considers whether the ALJ erred by rejecting the assessments from Plaintiff's treating providers, Dennis C. Westin, M.D. ("Dr. Westin") and Carol E. Stewart, NP ("NP Stewart") and agency examining physician, Gregory Hunter, M.D. ("Dr. Hunter"). (Doc. 8 at 1).

A. **Factual Overview**

Plaintiff applied for Social Security Disability Insurance benefits in September 2021, alleging disabilities beginning September 1, 2021. (Doc. 8 at 2). Plaintiff has a high school education and reported past light-to-heavy, semi-skilled jobs. (Doc. 8 at 2). Plaintiff alleged that she suffers from: cervical degenerative disc disease; arthritis of the shoulder

1   and knee; obesity; migraines; anxiety; post-traumatic stress disorder ("PTSD"); and

2   attention deficit hyperactivity disorder ("ADHD"). (Doc. 8 at 2). The SSA initially denied

3   Plaintiff's claims on April 21, 2023, and upon reconsideration on October 17, 2023. (Doc.

4   8 at 2). The ALJ issued his decision on May 22, 2024, finding Plaintiff had not been

5   disabled, as defined by the Social Security Act, from September 1, 2021 through the date

6   of the decision. (Doc. 8 at 2). The SSA Appeals Council denied a request for review of the

7   ALJ's decision and adopted the decision as final. (Doc. 8 at 2).

8           Plaintiff filed the present appeal following this unfavorable decision. (Doc. 1).

9                   **B.  The SSA's Five-Step Evaluation Process**

10          To qualify for social security disability insurance benefits, a claimant must show

11  that she "is under a disability." 42 U.S.C. § 423(a)(1)(E). To be "under a disability," the

12  claimant must be unable to engage in "substantial gainful activity" due to any medically

13  determinable physical or mental impairment that can be expected to result in death or that

14  has lasted or can be expected to last for a continuous period of not less than twelve months.

15  *Id.* § 423(d)(1). The impairment must be of such severity that the claimant cannot do her

16  previous work or any other substantial gainful work within the national economy. *Id.* §

17  423(d)(2). The SSA has created a five-step sequential evaluation process for determining

18  whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)(1). The steps are followed

19  in order, and each step is potentially dispositive. *See id.* § 404.1520(a)(4).

20          At Step One, the ALJ determines whether the claimant is engaging in "substantial

21  gainful activity." *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is work activity that

22  is: (1) "substantial," e.g., doing "significant physical or mental activities"; and (2)

23  "gainful," e.g., usually done "for pay or profit." 20 C.F.R. § 416.972(a)–(b). If the claimant

24  is engaging in substantial gainful work activity, the ALJ will find the claimant is not

25  disabled. *Id.* § 404.1520(a)(4)(i).

26          At Step Two, the ALJ determines whether the claimant has "a severe medically

27  determinable physical or mental impairment" or severe "combination of impairments." *Id.*

28  § 404.1520(a)(4)(ii). To be "severe," the claimant's impairment must "significantly limit"

1    the claimant's "physical or mental ability to do basic work activities." *Id.* § 404.1520(c).

2    If the claimant does not have a severe impairment or combination of impairments, the ALJ

3    will find the claimant is not disabled. *Id.* § 404.1520(a)(4)(ii).

4         At Step Three, the ALJ determines whether the claimant's impairment(s) "meets or

5    equals" an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* §

6    404.1520(a)(4)(iii). If so, the ALJ will find the claimant is disabled, but if not, the ALJ

7    must assess the claimant's "residual functional capacity" ("RFC") before proceeding to

8    step four. *Id.* §§ 404.1520(a)(4)(iii), 404.1520(e). The claimant's RFC is her ability to do

9    physical and mental work activities "despite [her] limitations," based on all relevant

10   evidence in the case record. *Id.* § 404.1545(a)(1). To determine RFC, the ALJ must

11   consider all the claimant's impairments, including those that are not "severe," and any

12   related symptoms that "affect what [the claimant] can do in a work setting." *Id.* §§

13   404.1545(a)(1)–(2).

14        At Step Four, the ALJ determines whether the claimant has the RFC to perform the

15   physical and mental demands of "[her] past relevant work." *Id.* §§ 404.1520(a)(4)(iv),

16   404.1520(e). "Past relevant work" is work the claimant has "done within the past five years,

17   that was substantial gainful activity." *Id.* § 404.1560(b)(1). If the claimant has the RFC to

18   perform her past relevant work, the ALJ will find the claimant is not disabled. *Id.* §

19   404.1520(a)(4)(iv). If the claimant cannot perform her past relevant work, the ALJ will

20   proceed to Step Five.

21        Finally, at Step Five, the ALJ considers whether the claimant "can make an

22   adjustment to other work," considering her RFC, age, education, and work

23   experience. *Id.* § 404.1520(a)(v). If so, the ALJ will find the claimant not disabled. *Id.* If

24   the claimant cannot make this adjustment, the ALJ will find the opposite. *Id.*

25        **C. The ALJ's Application of the Factors**

26        Here, at Step One, the ALJ concluded that Plaintiff had not engaged in substantial

27   gainful activity since September 1, 2021, the alleged onset date of disability. (Doc. 7-3 at

28   18).

At Step Two, the ALJ determined that Plaintiff had the following severe impairments: cervical degenerative disc disease; arthritis of the shoulder and knee; obesity; migraines; anxiety; PTSD; and ADHD. (Doc. 7-3 at 17). The ALJ found that Plaintiff's severe impairments, while not disabling, significantly limit her ability to perform basic work activities. (Doc. 7-3 at 19).

At Step Three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that met or medically equaled a listed impairment in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  (Doc. 7-3 at 19). The ALJ determined that Plaintiff has the RFC to perform a range of medium work as defined in 20 CFR 404.1567(c) with the following limitations:

> The claimant can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant can never climb ladders, ropes or scaffolds. The claimant can never be exposed to workplace hazards, such as unprotected heights and moving mechanical parts. The claimant can occasionally be exposed to extreme temperatures and vibration. The claimant can avoid ordinary hazards in the workplace. The claimant can be exposed to moderate noise. The claimant can perform simple, routine tasks. The claimant can interact with supervisors, coworkers, and the public occasionally. The claimant can make simple work-related decisions. The claimant can tolerate occasional changes in a routine work setting.

(Doc. 7-3 at 21–22).

At Step Four, the ALJ determined that Plaintiff was unable to perform her past relevant work as a medical assistant and stock clerk. (Doc. 7-3 at 37). At Step Five, the ALJ found Plaintiff could perform a significant number of jobs in the national economy given her age, education, work experience, and RFC, including work as a motor vehicle assembler, laboratory equipment cleaner, and warehouse worker. (Doc. 7-3 at 36–37). Accordingly, the ALJ concluded that Plaintiff was not disabled under the Social Security Act from September 1, 2021, the alleged disability onset date, through the date of the ALJ's decision. (Doc. 7-3 at 37).

## II.    LEGAL STANDARD

This Court may not set aside a final denial of disability benefits unless the ALJ's decision is "based on legal error or not supported by substantial evidence in the record."

1   *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Benton ex rel. Benton v.*
2   *Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). Substantial evidence refers to "such
3   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
4   *Id.* (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.
5   1988)). The Court, in its review, must consider the record in its entirety, "weighing both
6   the evidence that supports and evidence that detracts from the [ALJ's] conclusion." *Id.*
7   (quoting *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014)).

8       The ALJ—not this Court—is responsible for resolving ambiguities, resolving
9   conflicts in medical testimony, determining credibility, and drawing logical inferences
10  from the medical record. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing
11  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)); *Gallant v. Heckler*, 753 F.2d
12  1450, 1453 (9th Cir. 1984)). Thus, when the evidence of record could result in more than
13  one rational interpretation, "the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d
14  625, 630 (9th Cir. 2007); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th
15  Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational
16  interpretation, [the Court] must defer to the ALJ's conclusion."). Further, this Court may
17  only review the reasons the ALJ provides in the disability determination; it "may not affirm
18  the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

19  **III.    DISCUSSION**

20      Plaintiff claims that the ALJ committed materially harmful error by rejecting the
21  assessments from Dr. Westin, NP Stewart, and Dr. Hunter without providing sufficient
22  explanation supported by substantial evidence. (Doc. 8 at 11). The Court considers
23  Plaintiff's claims regarding each provider in turn.

24          **A. Legal Standard for Evaluation of Medical Opinions**

25      Previously, under the "treating physician rule," courts in the Ninth Circuit
26  distinguished among treating physicians, examining physicians, and non-examining
27  physicians, with the greatest weight generally given to the opinions of treating physicians.
28  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *Regula v. Delta Family-Care*

1    *Survivorship Plan*, 266 F.3d 1130, 1139 (9th Cir. 2001), *cert. granted, vacated sub nom.*

2    *Regula v. Delta Family-Care Disability & Survivorship Plan*, 539 U.S. 901 (2003).

3    However, in March 2017, the SSA amended their regulations, and among other changes,

4    abrogated the treating physician rule. *Alonzo v. Comm'r of Soc. Sec. Admin.*, No. CV-18-

5    08317-PCT-JZB, 2020 WL 1000024, *3 (D. Ariz. Mar. 2, 2020) (citing *Revisions to Rules*

6    *Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819,

7    *5852–57 (Jan. 18, 2017)). Consequently, these amended regulations govern all claims

8    filed on or after March 27, 2017. (*Id.*) The amended regulations forbid an ALJ to "defer or

9    give any specific evidentiary weight, including controlling weight, to any medical

10   opinion(s) or prior administrative medical finding(s), including those from . . . medical

11   sources." 20 C.F.R. §§ 404.1520c, 416.920c.

12        Additionally, the amended March 2017 SSA regulations require an ALJ to "consider

13   all medical opinions according to several enumerated factors, including whether the

14   opinion is supported by objective medical evidence and whether the opinion is consistent

15   with the evidence from other sources." *Alonzo*, 2020 WL 1000024, at *3. The two "most

16   important factors" are supportability and consistency, and the ALJ must explain how, given

17   these two factors, he considered the evidence for a medical source's opinions. 20 C.F.R §

18   404.1520c(b)(3).

19        Moreover, the Ninth Circuit recently determined that in cases falling under the

20   amended March 2017 SSA regulations, the "specific and legitimate" standard is also no

21   longer applicable. *See Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). In *Woods*, the

22   Ninth Circuit concluded the following:

23           Our requirement that ALJs provide "specific and legitimate reasons" for
     rejecting a treating or examining doctor's opinion, which stems from the
24   special weight given to such opinions, is likewise incompatible with the
     revised regulations. Insisting that ALJs provide a more robust explanation
25   when discrediting evidence from certain sources necessarily favors the
     evidence from those sources—contrary to the revised regulations.
26

27   *Id.* (quotations and internal citations omitted). Thus, it is not required that an ALJ provide

28   "specific and legitimate reasons" to reject a treating physician's assessment. *Id.* at 791.

1  Rather, an ALJ's decision to discredit any medical opinion must simply be supported by
2  substantial evidence. *Id.* at 787.

3  As discussed previously, the ALJ, not the reviewing Court, is responsible for
4  resolving any conflicts or ambiguities within the medical testimony and medical record.
5  *See Andrews*, 53 F.3d at 1039. Thus, when more than one rational interpretation could
6  emerge from the evidence of record, "the ALJ's decision must be upheld." *Orn*, 495 F.3d
7  at 630; *see also Matney v. Sullivan*, 981 F.2d 1015, 1019 (9th Cir. 1992) (citations omitted)
8  ("[I]f the evidence can support either outcome, the [C]ourt may not substitute its judgment
9  for that of the ALJ.").

### B. The ALJ's Evaluation of Dr. Westin's Medical Opinion

11  In May 2023, Dr. Westin, Plaintiff's treating psychiatrist, completed a supplemental
12  questionnaire regarding her RFC. (Doc. 7-9 at 47–48). Dr. Westin opined that Plaintiff had
13  severe depression and anxiety, with "markedly decreased cognition" due to those illnesses
14  and "a history of head trauma." (Doc. 7-9 at 48; Doc. 7-3 at 34). Dr. Westin found that
15  Plaintiff had marked to extreme limitations in mental functioning, would be off task more
16  than 30% of the workday, and would be absent from work five days or more per month.
17  (Doc. 7-9 at 47–48). Dr. Westin completed the same questionnaire in March 2024 and
18  found Plaintiff had moderate to extreme limitations concentrating, following instructions,
19  maintaining pace in a work environment, and interacting appropriately with others. (Doc.
20  7-9 at 82–83). The ALJ found Dr. Westin's opinions unpersuasive for the following
21  reasons:

22  [Dr. Westin] had a chance to examine and observe the claimant in providing
   an opinion. However, [Dr. Westin's] opinions are inconsistent with the
23  overall medical evidence of record. Notably, [Dr. Westin's] opinions are not
   supported by his own treatment notes showing that the bulk of the
24  appointments focused on the claimant's heightened symptoms stemming
   from numerous situational stressors in her life, which included a strained
25  home life. In addition, [Dr. Westin's] opinions are also not supported by
   medical evidence showing that her mental health symptoms are otherwise
26  stable and managed effectively on her medication regimen. Moreover, [Dr.
   Westin's] opinions are inconsistent with [claimant's] presentation and
27  performances throughout the record. She presented as alert and oriented
   during treatment visits. She demonstrated above average intelligence. She
28  also demonstrated intact memory and concentration. She engaged in a
   pleasant and cooperative manner with medical/mental health professionals.

> Further, [Dr. Westin's] opinions are inconsistent with her ability to be the primary caretaker of the animals on the property (2 horses, 1 goat, 3 dogs). She is also able to maintain activities of daily living independently, which include going out unaccompanied, driving, and shopping for necessities. This evidence suggests that her mental health symptoms are not as limiting as alleged or reflected in the doctor's opinion. Finally, there is no medical evidence in the record to establish that the claimant has a history of head trauma[.]

(Doc. 7-3 at 34).

Plaintiff argues the ALJ erred in rejecting Dr. Westin's opinion because: (1) the ALJ improperly found that Plaintiff's "heightened mental symptoms stemmed from situational stressors in her life," which was unsupported by the record; (2) the ALJ, by finding that Plaintiff's medication effectively managed her mental symptoms, "failed to view any reported improvement . . . in the broader context of Plaintiff's mental impairments and the complete record"; (3) the ALJ improperly relied on "unrelated normal findings" regarding Plaintiff's cognitive abilities to "support an inconsistency finding between Dr. Westin's assessments" and the other record evidence; and (4) the ALJ failed to explain the inconsistency between Plaintiff's daily activities and Dr. Westin's assessed limitations. (Doc. 8 at 13–18). The Court addresses each of the alleged errors in turn.

### i. Situational Stressors

Dr. Westin opined that Plaintiff had severe depression and anxiety that markedly limited her cognitive abilities. (Doc. 7-9 at 47–48). During Plaintiff's visits with Dr. Westin, she reported multiple stressful events in her life, including "challenges stemming from her strained home life with her husband and adult son, [a] strained relationship with her older sister, and financial troubles." (Doc. 7-3 at 28, citing Doc. 7-8 at 112, 115–16, 122–23, 129–30, 138; Doc. 7-9 at 45, 51–52, 97). The ALJ found that Plaintiff's heightened mental health symptoms were primarily due to situational stressors and that other medical evidence showed Plaintiff's "mental health symptoms [were] otherwise stable and managed effectively on her medication regimen." (Doc. 7-3 at 34).

Plaintiff argues that her symptoms were not merely attributable to situational stressors, that her symptoms persisted despite those intermittent stressors, and that she "had

multiple medication adjustments during the relevant period due to ongoing mental health problems." (Doc. 8 at 13). Plaintiff further argues that Dr. Westin, not the ALJ, was in the best position to assess how her symptoms would "translate into work-related functioning." (Doc. 8 at 14).

"Social Security disability determinations must be based on medically determinable impairments, not situational stressors." *Lorilyn W. v. Comm'r Soc. Sec. Admin.*, 6:19-CV-00925-YY, 2020 WL 7028475, at *5 (D. Or. Nov. 30, 2020) (citing *Chesler v. Colvin*, 649 Fed. Appx. 631, 632 (9th Cir. 2016)). However, the ALJ must also consider the whole record and refrain from solely relying on situational stressors to "downplay the impact of a mental health crisis." *Lacie R. v. Berryhill*, 6:17-CV-1952-SI, 2019 WL 1919168, at *6 (D. Or. Apr. 30, 2019); *compare Chesler*, 649 Fed. Appx. at 632 (ALJ properly rejected claimant's subjective system testimony when the record showed his "mental health symptoms were situational, and [thus] unlikely to persist once [claimant's] circumstances improved") *with Dockstader v. Comm'r of Soc. Sec. Admin.*, 3:18-CV-8163-HRH, 2019 WL 1274986, at *6–7 (D. Ariz. Mar. 20, 2019) (ALJ erred by suggesting claimant's symptoms were the result of situational stressors because other evidence in the record indicated claimant's "symptoms were a result of *more than* 'situational stressors'") (emphasis added).

It is true that Plaintiff reported several stressful life events to Dr. Westin throughout the course of her treatment.[1] But there is also record evidence suggesting that Plaintiff's symptoms were not solely attributable to these external events. Indeed, Plaintiff reported

---

[1] On September 1, 2021, she reported having "some stress in her marriage," as well as stress related to her work responsibilities and wage garnishment. (Doc. 7-8 at 112). On October 6, 2021, Plaintiff reported having a "hard time," and believed it was related to a recent incident with her husband and the fact that her son, a recovering drug addict, moved in with her. (Doc. 7-8 at 115–16). On October 18, 2021, Plaintiff discussed "new stress" stemming from reconnecting with her older sister. (Doc. 7-8 at 119–20). On December 8, 2021, Plaintiff and Dr. Westin discussed ongoing stress in Plaintiff's marriage and the loss of her job. (Doc. 7-8 at 122–23; see also Doc. 7-8 at 126 (same)). On July 27, 2022, Plaintiff reported "a lot of stress in [her] marriage and some PTSD from [her] son living" with her. (Doc. 7-8 at 130; see also Doc. 7-8 at 140 (same)). On December 5, 2022, Plaintiff reiterated frustrations with her living situation and disclosed that she and her husband were having "big financial problems." (Doc. 7-9 at 45). On May 23, 2023, Plaintiff again reported stress from her marriage and son. (Doc. 7-9 at 52; see also Doc. 7-9 at 98 (same)).

to Dr. Westin that she "sometimes . . . falls into depression **for no reason** and sometimes due to situations." (Doc. 7-8 at 102 (emphasis added); see also Doc. 7-8 at 108 (reporting anxiety that "came on suddenly for no reason")). Because some evidence showed that Plaintiff's mental health symptoms were unrelated to her stressful life events, it may have been error for the ALJ to discredit Dr. Westin's opinion on the "situational stressor" basis.

However, the Court need not resolve this question, because the ALJ did not discredit Dr. Westin on this basis alone—he went on to note that Dr. Westin's opinion was both inconsistent with his own treatment notes and other medical evidence in the record. (Doc. 7-3 at 34). Plaintiff presented as alert and oriented during treatment visits, demonstrated above average intelligence, and demonstrated intact memory and concentration. (Doc. 7-3 at 34). This evidence is inconsistent with Dr. Westin's opinion that Plaintiff's mental health symptoms resulted in "markedly decreased cognition" and marked limitations in concentration and memory. (Doc. 7-9 at 48). The ALJ reasonably relied on this inconsistency to support his decision to discredit Dr. Westin's assessment. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162–63 (9th Cir. 2008) (quoting *Batson*, 359 F.3d at 1195–97 (any error in an ALJ's credibility analysis is harmless if there is substantial evidence supporting the ALJ's credibility determination and the error does not "negate the validity of the ALJ's ultimate credibility conclusion")); *see also Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.").

ii.  Improvement or Stability in Plaintiff's Mental Health Symptoms

The ALJ further found that Dr. Westin's opinions were not supported because the medical evidence showed Plaintiff's mental health symptoms were "otherwise stable and managed effectively on her medication regimen," except when influenced by situational stressors. (Doc. 7-3 at 34). Plaintiff argues the ALJ "failed to view any reported improvement or stability with medication in the broader context of Plaintiff's mental impairments and the complete record." (Doc. 8 at 14). Plaintiff asserts that her treatment

records show her symptoms "persisted despite numerous medication trials and adjustments" and that her "occasional reports of improvement" did not serve as a sufficient basis to discredit Dr. Westin's assessments. (Doc. 8 at 14–15).

The Ninth Circuit Court of Appeals has emphasized that in the context of mental health issues, it is error "to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). This is because "cycles of improvement and debilitating symptoms are a common occurrence," and mental health symptoms "wax and wane in the course of treatment." *Id.*

Over the course of her treatment with Dr. Westin, Plaintiff *did* report some improvement in her symptoms. For example, in early October 2021, Plaintiff reported having a hard time, having suicidal thoughts, and feeling down, which prompted Dr. Westin to adjust her medication. (Doc. 7-8 at 115). At an appointment later that month following the medication adjustment, Plaintiff reported she was "starting to feel better," that "the depression [was] coming down," and that she experienced "fewer suicidal thoughts." (Doc. 7-8 at 119–20). However, a review of Plaintiff's entire treatment record with Dr. Westin reveals that her symptoms continued despite multiple adjustments to her prescribed medication. Even though Plaintiff's depression appeared to improve in October 2021, her appointment notes during that time indicate she continued to struggle with anxiety. (Doc. 7-8 at 119 (noting "anxiety is still an issue")). In December 2021, Plaintiff reported feeling agitated and depressed and Dr. Westin adjusted her medication again. (Doc. 7-8 at 122). In July 2022, Plaintiff's mood was "severely depressed," she experienced "severe anxiety," and had suicidal thoughts. (Doc. 7-8 at 130). In May 2023, Plaintiff reported "constant" suicidal thoughts, (Doc. 7-9 at 51), and in February 2024, Plaintiff reported continued feelings of depression and anxiety, (Doc. 7-9 at 97).

It appears to the Court that the ALJ discredited Dr. Westin's assessment by erroneously relying on isolated reports of improvement in Plaintiff's symptoms and wholly disregarding Plaintiff's persistent reports of depression, anxiety, and suicidal ideation.

However, this error is ultimately harmless because the ALJ provided a valid, alternative explanation for discrediting Dr. Westin's assessment. As discussed, the ALJ found that Dr. Westin's assessment was inconsistent with his own treatment notes and other evidence in the record. This conclusion is supported by substantial evidence in the record that confirms Plaintiff possessed "above average" intelligence, was alert and oriented during treatment, and demonstrated intact memory and concentration. Because this evidence suggests that Plaintiff's mental health symptoms did not impact her cognitive abilities to the extent Dr. Westin alleged, the ALJ did not err by finding Dr. Westin's assessment unpersuasive. *Carmickle*, 533 F.3d at 1162 (an ALJ's error in relying on one of several reasons to support of an adverse credibility determination is harmless if "the ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record").

### iii. Normal Findings Regarding Plaintiff's Cognitive Abilities

The ALJ emphasized that Plaintiff's "presentation and performances throughout the record"—such as her alertness, ability to concentrate, and above-average intelligence—were inconsistent with Dr. Westin's assessed limitations. Plaintiff argues the ALJ's reliance on "unrelated normal findings" does not support his conclusion that Dr. Westin's assessment was inconsistent with the record evidence. (Doc. 8 at 17). Plaintiff contends that evidence of Plaintiff's "normal" cognitive functioning was irrelevant because Dr. Westin's assessments were based on mood disorders like depression, anxiety, and PTSD. (Doc. 8 at 17 (citing *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) ("[O]bservations of cognitive functioning during therapy sessions do not contradict [a claimant's] reported symptoms of depression and social anxiety."))).

It is true Dr. Westin provided treatment to address Plaintiff's mental health symptoms rather than a cognitive deficit. However, the ALJ did not use evidence of Plaintiff's cognitive abilities to discredit Dr. Westin's opinion that Plaintiff suffered from

severe mental health symptoms generally.[2] Rather, the ALJ relied on evidence of Plaintiff's cognitive abilities to discredit Dr. Westin's opinion regarding the *extent* to which Plaintiff's mental health symptoms impacted her ability to perform various work-related activities.

Indeed, Dr. Westin's assessments considered how Plaintiff's mental health symptoms influenced her RFC. The assessment was a checked-box form allowing Dr. Westin to select Plaintiff's alleged limitation regarding work-related activities like: understanding, remembering, and carrying out instructions; applying information to make judgments on work-related decisions; maintaining attention and concentration; performing activities within a schedule at a consistent and continuous pace; and interacting appropriately with the public, supervisors, and co-workers. (Doc. 7-9 at 47). Dr. Westin "rated" Plaintiff for each activity on a scale from "none" (absent or minimal limitations) to "extreme" (major limitations, claimant has no useful ability to function).  In Dr. Westin's 2023 assessment, he rated Plaintiff's limitations as "marked" (serious limitations, claimant's ability to function is severely limited) or "extreme" for all listed activities. (Doc. 7-9 at 47). In Dr. Westin's 2024 assessment, he rated Plaintiff's limitations as "moderate," "marked," or "extreme" for all listed activities. (Doc. 7-9 at 82).

The assessment tested the *extent* to which Plaintiff's mental health symptoms impacted her ability to complete work-related tasks such as concentrating, following instructions, and interacting with others. Other medical evidence related to Plaintiff's ability to perform these tasks was thus relevant to determining Dr. Westin's credibility and the weight to afford his opinions. Dr. Westin's own reports, in addition to other medical reports in the record, stated that Plaintiff was alert and oriented, demonstrated intact memory and concentration, and engaged in a pleasant manner with medical professionals. (Doc. 7-3 at 21, 34).  This evidence is inconsistent with Dr. Westin's opinion that Plaintiff's mental health symptoms resulted in "marked" or "extreme" limitations concentrating or interacting with others. The ALJ relied on these inconsistencies to permissibly conclude that Plaintiff's mental health symptoms were not as limiting as Dr. Westin alleged. *See*

---

[2]  As discussed, the ALJ found that Plaintiff had the following severe medically determinable mental health impairments: anxiety, PTSD, and ADHD. (Doc. 7-3 at 18).

*Connett v. Barnhart*, 340 F.3d 871, 874–75 (9th Cir. 2003) (finding the fact that a physician's opinion was not supported by his own treatment notes was a valid reason to not credit the opinion); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (holding that the ALJ's rejection of a treating physician's opinion because the medical records were inconsistent with the limitations set forth in that physician's opinion constituted a "specific and legitimate reason" for discrediting that opinion); *see Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[An] ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions.") (cleaned up).

### iv. Plaintiff's Daily Activities

Finally, the ALJ found that Dr. Westin's assessed limitations were inconsistent with Plaintiff's role as the primary caretaker of two horses, one goat, and three dogs on her property and her "activities of daily living independently," including going out unaccompanied, driving, and shopping for necessities. (Doc. 7-3 at 34). Plaintiff argues the ALJ erred by failing to explain the inconsistency between her daily activities and Dr. Westin's assessment. (Doc. 8 at 18).

An ALJ may discount a medical opinion when it is inconsistent with a Plaintiff's level of activity. *See Ghanam v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (when a physician's opinion regarding a claimant's "cognitive and social functioning and ability to engage in meaningful adult activities or employment" conflicts with the claimant's daily activities, that conflict "may justify rejecting a treating provider's opinion"); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600–02 (9th Cir.1999) (considering an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount the treating physician's opinion).

Dr. Westin found that Plaintiff had marked to extreme limitations maintaining attention and concentrating, performing activities within a schedule at a consistent and continuous pace, and sustaining an ordinary routine without special supervision. (Doc. 7-9 at 82). But the record showed that Plaintiff was able to take on robust responsibilities at home, including caring for three dogs, two horses, and a goat on a daily basis. (Doc. 7-3 at

30). Plaintiff could also independently manage her self-care needs, cook meals, perform household chores, drive, and go shopping. (Doc. 7-3 at 30). Plaintiff's ability to regularly perform these tasks are inconsistent with Dr. Westin's position that she either had "no useful ability to function" or was "severely limited" in her ability to concentrate or maintain a scheduled routine. Because Plaintiff's daily activities suggest a higher level of functioning, the ALJ did not err by discrediting Dr. Westin's assessment on this basis. *See Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990) (plaintiff's ability to "take care of her personal needs, prepare easy meals, do light housework, and shop for some groceries" could be seen as inconsistent with "the presence of a condition which would preclude all work activity"); *Margo G. v. Comm'r, Soc. Sec. Admin.*, No. 3:20-CV-01002-IM, 2022 WL 2700291, at *5 (D. Or. July 12, 2022) (an ALJ need not "exhaustively chronicle a plaintiff's daily activities minute by minute" or provide "granular detail" of each individual activity so long as the daily activities, taken together, provide a legitimate basis to reject a doctor's opinion).

### C. The ALJ's Evaluation of NP Stewart's and Dr. Hunter's Medical Opinions

The ALJ found that both NP Stewart's and Dr. Hunter's opinions were "not persuasive," and provided largely identical reasoning for discrediting each physician. (Doc. 7-3 at 31 (Dr. Hunter); Doc. 7-3 at 34–35 (NP Stewart)). Because the ALJ's reasoning for discrediting both providers was duplicative, some of Plaintiff's challenges to the ALJ's rationale are also duplicative. To avoid needlessly repetitive analysis, the Court will address Plaintiff's identical challenges regarding each provider together, and separately analyze challenges specific to a particular provider. Next, the Court will: summarize NP Stewart's and Dr. Hunter's opinions; outline the ALJ's rational for discrediting these opinions; and address Plaintiff's duplicative and specific challenges regarding the ALJ's decision to discredit each provider.

### i. NP Stewart and Dr. Hunter Opinions and the ALJ's Rationale

While Dr. Westin oversaw Plaintiff's mental health treatment, NP Stewart and Dr.

1    Hunter both saw Plaintiff regarding her physical limitations. During Plaintiff's

2    appointments with NP Stewart, she complained of right knee, left shoulder, and neck pain,

3    as well as headaches. (Doc. 7-3 at 26). Plaintiff primarily complained of right knee pain to

4    Dr. Westin. (Doc. 7-8 at 155).

5        NP Stewart completed two medical assessments regarding Plaintiff's ability to

6    engage in work-related activities in June 2023 and February 2024. (Doc. 7-9 at 57; Doc. 7-

7    9 at 80). The ALJ summarized NP Stewart's findings as follows:

> In a June 2023, statement, [NP] Stewart . . . opined that the claimant can lift up to five pounds occasionally and rarely lift up to 10 pounds. Ex. 20F/1. She opined that the claimant can sit for 30 minutes at a time and three hours total and stand/walk for 30 minutes at a time and three hours total in an eight-hour workday. Ex. 20F/1. She also opined that the claimant can occasionally stoop and squat, as well as rarely crawl and climb. Ex. 20F/1. She further opined that the claimant can occasionally reach, handle, push/pull, finger, and feel bilaterally. Ex. 20F/2. She also opined that the claimant is unable to use her feet to perform repetitive movement. Ex. 20F/2. She further opined that the claimant has moderate restrictions with activities involving occupational driving, exposure to pulmonary irritants, and exposure to marked changes in temperature or humidity, as well as a total restriction with activities involving unprotected heights and being around moving machinery. Ex. 20F/2. She concluded that the claimant will be off task greater than 15% of the time due to pain and fatigue. Ex. 20F/2.

> In a February 2024 statement, she opined that the claimant can lift up to five pounds frequently and up to 10 pounds occasionally. Ex. 24F/1. She opined that the claimant can sit for 15 minutes at a time and three hours total and stand/walk for 15 minutes at a time and three hours total in an eight-hour workday. Ex. 24F/1. She also opined that the claimant can rarely stoop, squat, crawl, and climb. Ex. 24F/1. She further opined that the claimant can occasionally handle, finger, and feel bilaterally, as well as rarely reach and push/pull bilaterally. Ex. 24F/2. She also opined that the claimant is unable to use her feet to perform repetitive movement. Ex. 24F/2. She further opined that the claimant has moderate restrictions with activities involving occupational driving, exposure to pulmonary irritants, and exposure to marked changes in temperature or humidity, as well as a total restriction with activities involving unprotected heights and being around moving machinery. Ex. 24F/2. She concluded that the claimant will be off task greater than 15% of the time due to pain and fatigue. Ex. 24F/2.

24    (Doc. 7-3 at 34–35 (citing Doc. 7-9 at 80–81 and Doc. 7-9 at 57–58)). The vocational expert

25    testified that NP Stewart's assessed limitations would preclude Plaintiff from any work

26    activity. (Doc. 8 at 24; Doc. 7-3 at 58–59).

27        Dr. Hunter performed a consultative medical exam on Plaintiff in October 2022, and

28    she cited "right knee pain" as her "greatest physical health concern." (Doc. 7-8 at 155). She

also complained of right shoulder and arm pain, and migraine headaches. (Doc. 7-8 at 155). The ALJ summarized Dr. Hunter's assessment as follows:

> Dr. Hunter opined that the claimant can perform sedentary level work. Ex. 8F/5, 6. The doctor also opined that she can frequently stoop, kneel, and crawl, as well as occasionally crouch and climb ramps or stairs. Ex. 8F/6, 7. However, he opined that she can never climb ladders, ropes, or scaffolds. Ex. 8F/7. He further opined that she can frequently reach with the right. Ex. 8F/7. He also opined that she has limitations with working around heights. Ex. 8F/7. He further opined that she has limitations with seeing due to decreased visual acuity in the left eye. Ex. 8F/6.

(Doc. 7-3 at 31, citing Doc. 7-8 at 155–57).

The ALJ found the two physicians' opinions unpersuasive because they were: inconsistent with the record as a whole; unsupported by their "unremarkable physical examination findings"; inconsistent with both Plaintiff's imaging studies (which showed only mild findings) and "unremarkable" treatment history for her physical conditions; and inconsistent with Plaintiff's daily activities. (Doc. 7-3 at 31, 35). Plaintiff contends the ALJ's explanations are not supported by substantial evidence. (Doc. 8 at 19, 23).

    ii.  <u>Plaintiff's Duplicative Challenges re: Discrediting NP Stewart and Dr. Hunter</u>

Plaintiff challenges the ALJ's decision to discredit NP Stewart and Dr. Hunter on three of the same grounds, which the Court addresses in turn below.

    1.  Plaintiff's "Lack of Treatment" for Physical Issues

The ALJ found the two physicians' medical assessments—finding Plaintiff was incapable of work (NP Stewart) or only capable of sedentary work (Dr. Hunter)—were inconsistent with Plaintiff's "completely unremarkable treatment history for her physical conditions, which primarily consisted of treating her pain and migraines with over-the-counter medications." (Doc. 7-3 at 31, 35). Plaintiff asserts the ALJ erred by discounting NP Stewart's and Dr. Hunter's opinions "due to lack of treatment for [Plaintiff's] physical impairments" because the record showed Plaintiff did not have insurance or the independent financial means to pay "for much treatment related to her physical impairments." (Doc. 8 at 19; see also Doc. 8 at 23).

- 17 -

Before discounting the severity of a claimant's impairments due to "failure to seek more aggressive treatment," an ALJ must inquire about or consider reasons why the claimant "might not have sought additional or more aggressive treatment." *Torres v. Kijakazi*, No. 20-17272, 2021 WL 5638008, at \*2 (9th Cir. Dec. 1, 2021); *see also Carmickle*, 533 F.3d at 1161–62 (ALJ erred by discrediting claimant's complaints of pain based on his failure to seek more aggressive treatment because claimant's insurance did not cover more effective pain medication).

Some evidence in the record suggests Plaintiff could not receive or did not seek certain care because of financial limitations. Although NP Stewart and two ER doctors referred Plaintiff to an orthopedic surgeon to follow up on her reported knee pain in July 2022 and November 2023, she did not do so until March 2024 due to financial constraints. (Doc. 7-8 at 71 (Plaintiff stated "she was going to see an orthopedic specialist today but was unable to pay for the appointment"); Doc. 7-8 at 36 (Plaintiff reported having no insurance to obtain an MRI scan for her knee injury); Doc. 7-8 at 155 (Plaintiff had no insurance to receive additional medical evaluations for her knee)).

However, evidence in the record also indicates that, regardless of Plaintiff's ability to pursue more intensive treatment, Plaintiff's physical limitations only required conservative treatment. Indeed, when Plaintiff *did* visit an orthopedic surgeon in March 2024, she did not seek treatment for her knee (or even mention knee pain) but instead complained of neck pain. (Doc. 7-9 at 110). In that appointment, Plaintiff indicated she "would like to proceed with conservative intervention," which the doctor found "very reasonable," and noted he would "see [Plaintiff] back as necessary." (Doc. 7-9 at 111).

Ultimately, the Court need not resolve whether the ALJ erred by citing Plaintiff's "unremarkable treatment history" as a reason to discredit NP Stewart's and Dr. Hunter's assessments. Because the extent of the assessed limitations conflicted with the greater record and were inconsistent with the physicians' own treatment notes, as explained below, the ALJ's decision rested on an independent, permissible basis. *Carmickle*, 533 F.3d at 1162.

2.  Plaintiff's "Unremarkable" Physical Examination Findings

The ALJ found that the extent of NP Stewart's and Dr. Hunter's assessed limitations were inconsistent with each physician's individual examinations of Plaintiff and Plaintiff's "benign physical examination findings throughout the record." (Doc. 7-3 at 31, 35). The ALJ noted that Plaintiff ambulated with a normal gait, demonstrated full range of motion, strength, sensation, and reflexes of the upper and lower extremities, demonstrated intact grip strength, and that "there was no evidence of right knee instability." (Doc. 7-3 at 31-35). He further observed that Plaintiff's imaging studies of her lumbar spine, right shoulder, and right knee showed only "mild" findings. (Doc. 7-3 at 35).

Plaintiff argues that the ALJ failed to explain how these "normal findings" were inconsistent with NP Stewart's and Dr. Hunter's assessed limitations. (Doc. 8 at 21, 23). Plaintiff asserts that NP Stewart's assessments were supported "by her own observations that Plaintiff had decreased shoulder, right knee, and cervical motion, tenderness to palpitation to her right shoulder and cervical spine, and tenderness and swelling at her right knee." (Doc. 8 at 20). She argues that Dr. Hunter's assessed exertional limitations were properly based on a "combination of right shoulder arthropathy, [Plaintiff's] history of thoracic spine osteoarthritis, and right knee pain. (Doc. 8 at 23). Defendant argues that Plaintiff, by pointing out "some abnormalities" has at most "presented an alternative interpretation of the evidence," but cannot overcome the ALJ's interpretation of the record, which is entitled to substantial deference. (Doc. 12 at 14). The Court agrees.

At Step Two, the ALJ found that Plaintiff's cervical degenerative disc disease, arthritis of the shoulder and knee, and migraines were severe impairments. (Doc. 7-3 at 18). In acknowledging these limitations, the ALJ necessarily considered (and accounted for) the abnormal findings reflected in NP Stewart's and Dr. Hunter's examinations and assessments. However, the ALJ permissibly found that Plaintiff was not impaired to the extent alleged based upon the totality of the record. Record evidence demonstrated Plaintiff walked normally without assistance, had full range of motion in her upper and lower extremities, and did not experience instability in her right knee. Three DDS state agency

consultants (Dr. Chelton, Dr. Keer, and Dr. Braverman) found Plaintiff was capable of medium level work. (Doc. 7-3 at 32–33, 36). Another DDS state agency consultant, Dr. Donovan, found Plaintiff could perform simple, unskilled tasks in a low contact setting. (Doc. 7-3 at 36). Further, Dr. Hunter's assessment—noting that Plaintiff can only lift or carry 10 pounds—is inconsistent both with Plaintiff's self-report that she can lift up to 50 pounds and evidence in the record that Plaintiff pushed a wheelbarrow containing 150 pounds of horse feed. (Doc. 7-7 at 18; Doc. 7-8 at 65). NP Stewart's assessment—stating Plaintiff can only "continuously stand or walk" for 30 minutes at a time and can only occasionally lift "up to 5 pounds"—conflicts with multiple other medical assessments in the record, Plaintiff's daily activities (discussed below), and evidence that plaintiff moved 150 pounds of horse feed while performing chores. (Doc. 7-9 at 6 (plaintiff can occasionally lift 50 pounds; frequently lift 25 pounds); Doc. 7-4 at 9 (same); (Doc. 7-4 at 24 (same); Doc. 7-8 at 65).

Because there is ample evidence in the record contradicting the extent of the limitations assessed by both NP Stewart and Dr. Hunter, the ALJ did not err by discrediting their opinions. *See Andrews*, 53 F.3d at 1039 ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."); *Batson*, 359 F.3d at 1198 ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

### 3.  Plaintiff's Daily Activities

The ALJ found NP Stewart's and Dr. Hunter's assessments were inconsistent with Plaintiff's daily activities, which included caring for two horses, one goat, and three dogs on her property, cooking meals, performing household chores, driving, shopping, and self-care. Plaintiff argues the ALJ failed to explain how Plaintiff's daily activities were inconsistent with NP Stewart's and Dr. Hunter's assessed limitations. (Doc. 8 at 22, 23). Plaintiff specifically asserts there is no inconsistency between her activities and NP Stewart's assessment that Plaintiff could "still sit for three hours and stand/walk for three hours in an eight-hour workday." (Doc. 8 at 22).

1      Plaintiff's argument ignores the other limitations NP Stewart identified in her

2    assessment—namely, that Plaintiff could only lift "up to 5 pounds occasionally," and could

3    rarely lift any higher weight. (Doc. 7-9 at 57). The fact that Plaintiff was capable of lifting

4    and pushing a wheelbarrow containing 150 pounds of horse feed is so clearly inconsistent

5    with NP Stewart's assessed limitation that it does not require a more detailed explanation.

6    *Henry v. Comm'r of Soc. Sec. Admin.*, No. CV-24-03366-PHX-JAT, 2025 WL 2982389,

7    at *6 (D. Ariz. Oct. 23, 2025) (citing *Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir.

8    2022) ("In determining whether an ALJ's decision is supported by substantial evidence,

9    the Court looks 'to all pages' of the decision and reads it 'as a whole.'")). Plaintiff's daily

10   activities conflict with Dr. Hunter's assessed limitations (limiting her to lifting or carrying

11   10 pounds) for the same reasons.

12      The rest of the record shows Plaintiff cares for multiple farm animals and three dogs,

13   maintains a household of three people (herself, husband, and son), partakes in self-care,

14   cooks, shops, and drives. These substantive activities are inconsistent with the extreme

15   limitations assessed by NP Stewart (precluding Plaintiff from all work activity) and Dr.

16   Hunter (limiting Plaintiff to sedentary work only). Accordingly, substantial evidence

17   supports the ALJ's decision discredit both physicians on this basis. *Sullivan*, 981 F.2d at

18   1019 ("The [ALJ] and not the reviewing court must resolve conflicts in evidence, and if

19   the evidence can support either outcome, the court may not substitute its judgment for that

20   of the ALJ.").

21              iii.    Plaintiff's Specific Challenge re: Discrediting NP Stewart

22      Because Plaintiff raised a fourth challenge to the ALJ's rationale for discrediting

23   NP Stewart specifically, the Court addresses this argument separately. NP Stewart opined

24   that Plaintiff's impairments would result in her being "off task greater than 15% of the time

25   due to pain and fatigue." (Doc. 7-9 at 58). The ALJ noted that this opinion was inconsistent

26   with the [Plaintiff's] positive response to mental health treatment and demonstrated intact

27   cognitive functioning during treatment visits." (Doc. 7-3 at 35). Plaintiff emphasizes that

28   NP Stewart's off-task assessment was based on Plaintiff's pain and fatigue, not any mental

impairment. (Doc. 8 at 22). Plaintiff argues that the ALJ's inconsistency analysis falls flat because "cognition and mental health treatment [are] distinct from limitations [arising] from chronic pain and fatigue." (Doc. 8 at 22). Defendant fails to meaningfully engage with this argument and merely asserts that the ALJ "reasonably discounted Plaintiff's pain and fatigue symptoms because the normal physical examination findings, conservative course of treatment, and daily activities were not commensurate with [Plaintiff's] alleged degree of limitation." (Doc. 12 at 12–13).

It is unclear how Plaintiff's intact cognitive functioning and positive response to mental health treatments contradicts NP Stewart's opinion that Plaintiff would be off-task due to pain and fatigue. However, any error stemming from the ALJ's decision to discredit NP Stewart's off-task assessment on this basis is harmless because, as discussed, the ALJ provided other reasons supported by substantial evidence to support his decision. *See Carmickle*, 533 F.3d at 1162.

## IV.    ALTERNATIVE PROCEEDINGS

Finally, Plaintiff requests remand for a calculation of benefits pursuant to the credit-as-true rule, or in the alternative, further administrative proceedings. (Doc. 8 at 25). However, because the Court is upholding the ALJ's decision, the Court denies Plaintiff's request for remand without considering the credit-as-true doctrine. *See Leon v. Berryhill*, 880 F.3d 1041, 1047 (9th Cir. 2017) (stating a direct award of benefits is only appropriate "when the record clearly contradicted an ALJ's conclusory findings and no substantial evidence within the record supported the reasons provided by the ALJ for a denial of benefits").

## V.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is **affirmed**.

/ / /

/ / /

/ / /

1   **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment

2   accordingly.

3   Dated this 20th day of November, 2025.

4

5

6

7   James A. Teilborg

    Senior United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28